[Cite as *State v. Jackson*, 2019-Ohio-2130.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-37 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-17 |
| | : | |
| VICTOR JACKSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 31st day of May, 2019.

. . . . . . . . . . .

DAVID M. MORRISON, Atty. Reg. No. 0087487, Greene County Prosecutor's Office, Appellate Division, 61 Greene Street, Xenia, Ohio 45385
      Attorney for Plaintiff-Appellee

JENNIFER E. MARIETTA, Atty. Reg. No. 0089642, 64 East Main Street, Xenia, Ohio 45385
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Victor Jackson was convicted of abduction and domestic violence after a jury trial in the Greene County Court of Common Pleas. Jackson appeals from his convictions, claiming that they were based on insufficient evidence and against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed.

## I. The State's Evidence at Trial

{¶ 2} The State's evidence at trial established the following facts.

{¶ 3} At approximately 8:50 p.m. on December 25, 2017, Mary Howell went to the Speedway gas station near her home in Fairborn for coffee. When she pulled into the parking lot, she noticed a man standing outside the driver's side of a black Chevy truck parked a distance from the store and gas pumps. Howell did not think anything of it, and she parked and went into the store.

{¶ 4} Howell completed her purchase and got back into her vehicle. As she started to leave, she saw a woman "come around from the passenger's side of the vehicle like she was going into the store. And a man stopped her by the elbow and she tried to kind of get away. I [saw] blood all over her face and I got scared and called 9-1-1." (Tr. at 23.) Howell saw the man direct the woman around and into the truck. Howell testified that it did not appear that the man was attempting to render any aid, and that it appeared that the woman was resisting as the man "moved her along" to the side of the vehicle.

{¶ 5} In her 911 call, Howell told the dispatcher that she saw the woman get out of the passenger side of the truck. The man jumped out of the truck, "grabbed" the woman, and "dragg[ed]" her back to the truck. Howell indicated that the woman was fighting the man and trying to get away. Howell misidentified the race of the man during the 911 call,

and she explained at trial that she had focused on the woman, whom she described as very bloody "like a horror movie," not the man.

{¶ 6} The truck left the Speedway, and Howell followed in her vehicle. Howell saw the truck driving erratically, and she believed that she saw it hit a guardrail. Howell returned home after the police stopped the truck.

{¶ 7} J.S., the complainant, testified that she and Jackson began dating in October 2017, started living together immediately, and were in a relationship on December 25, 2017. In the early afternoon, she and Jackson met at Jackson's brother's home. Jackson, J.S., and some of Jackson's family sat around and drank. When Jackson and J.S. left approximately six or seven hours later, J.S. was, by her own account, "highly intoxicated." J.S. testified that, by that time, Jackson "was kind of being disrespectful" to other people.

{¶ 8} J.S. testified that, when they got into the truck to leave, Jackson's "whole demeanor changed. He was more aggressive. His tone was different; everything changed." (Tr. at 43.) J.S. testified that Jackson hit her with this fist approximately five minutes after they left in the truck. She stated, "He said I was being disrespectful and I was going to learn my lesson. He was tired of dealing with – excuse my language – dirty whores like myself. And he turned and he hit me. I thought he hit me with something at first but then I realized he was hitting me with his fist." (Tr. at 44.) J.S. testified that Jackson hit her six or seven times throughout the ride.

{¶ 9} J.S. tried to get into the back seat to kick her way out of the vehicle. Jackson grabbed her by her hair, dragged her to the front of the truck, and hit her face against the dashboard. J.S. repeatedly told Jackson, "Just let me out." She testified that she was

in severe pain and could barely see.

{¶ 10} J.S. did not recall a stop at the Speedway.   She stated that she would have run if she had been able to get out of the truck.   J.S. recalled when the police pulled the truck over.   She testified that Jackson told her, "We're getting pulled over, baby, I love you.   I didn't do it.   I didn't do it.   Don't say anything.   We're getting pulled over."   J.S. responded to him, "I just want out.   Just let me out."

{¶ 11} J.S. testified that she vaguely remembered making statements to the police, but she did not recall where she was when she spoke with the officers.   J.S. recalled waking up at the hospital.   J.S. testified that her nose was broken, her face was fractured, she had blood in her mouth, she could barely see, and her body was bruised and sore.

{¶ 12} J.S. testified that she had been in Jackson's vehicle almost every day for several months.   She denied having bled in the vehicle prior to December 25, 2017.

{¶ 13} Fairborn Police Officer Joshua Lightner testified that he was dispatched to the Speedway gas station on a report of a man and woman arguing outside the station and that the man had forced the woman into the truck as she tried to get away.   While Lightner was en route to the gas station, the dispatcher notified him that the truck had pulled away from the station and was proceeding down a particular road.   Lightner then heard that a witness was following the truck and that another officer had spotted it.   The other officer initiated a traffic stop.

{¶ 14} When Officer Lightner arrived at the scene of the stop, he observed that J.S. was "very bloody all over her face."   Officers apparently called for medics.   Officer Lightner questioned J.S. in the ambulance, but J.S. appeared to be intoxicated and stated that she could not remember anything.   Lightner took photographs of J.S. and of blood

spatter that was found above the glove box in the truck. Lightner testified that the blood appeared to be fresh blood.

{¶ 15} Officer Lightner transported Jackson to the police station. At the station, Jackson told the officer that he had picked up Jackson from another man's house that evening, and when she came out of the house, he noticed that she was bloody all over her face. Lightner testified that when he asked Jackson why he did not call the police or medics, Jackson responded that he "wasn't worried about it. He didn't care. That he was just headed to his place with her." (Tr. at 84.) When asked about any stops he had made during his drive home, Jackson denied that he had made any stops, including a stop at the Speedway. On cross-examination, Lightner acknowledged that his report did not include statements regarding whether Jackson had blood on his hands or clothing.

{¶ 16} Medics transported J.S. to the hospital, and Officer Lightner spoke with J.S. again while she was there, approximately one and a half hours after his initial interview with her. The officer described J.S. as "a little bit more coherent and * * * able to speak a little bit easier. She wasn't slurring her words near as badly." (Tr. at 88) J.S. told Officer Lightner that Jackson had caused her injuries.

{¶ 17} On cross-examination, Officer Lightner stated that Exhibit 3, a photograph, showed a leaf on J.S.'s shirt and mud on her pants. He testified that, when he asked her about that at the hospital, J.S. told him that she fell in the ditch outside the gas station and was dragged along the grass across the street from the gas station. Lightner testified that J.S. reported to him that she went to the bar where she worked that night, but she was not sure when she had been at the bar.

{¶ 18} The following morning, Alan Kraker, a domestic violence detective with the

Fairborn Police Department, went to the hospital to follow-up with J.S.. At that time, J.S.'s face was clean, but red and noticeably swollen. J.S. also had some abrasions. Kraker took photographs of J.S. and obtained a written statement from her. Kraker believed that J.S.'s memory of the event was affected by her intoxication at the time of the incident and the head injury she suffered.

{¶ 19} The parties stipulated that Jackson had two prior domestic violence convictions.

{¶ 20} On January 4, 2018, Jackson was indicted for abduction and domestic violence, both felonies of the third degree.[1] After a two-day trial, a jury convicted Jackson of both offenses. The court sentenced Jackson to 30 months in prison on each count, to be served consecutively, for a total of 5 years in prison.

{¶ 21} Jackson appeals, claiming that his convictions were based on insufficient evidence and against the manifest weight of the evidence.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 22} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio

---

[1] Under R.C. 2919.25(D)(4), domestic violence is a third-degree felony if the defendant previously has pleaded guilty to or been convicted of two or more offenses of domestic violence or other specified offenses.

St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 23} In contrast, when reviewing an argument challenging the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 24} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**A. Abduction**

{¶ 25} Jackson was found guilty of abduction, in violation of R.C. 2905.02(A)(2). That statute provides: "(A) No person, without privilege to do so, shall knowingly do any of the following: * * * (2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]" "Force" means "any violence, compulsion, or constraint physically exerted by

any means upon or against a person or thing." R.C. 2901.01(A)(1). "Privilege" is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12); *see State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶ 26.

{¶ 26} On appeal, Jackson claims that the State failed to present sufficient evidence of each element of abduction. He states: "The testimony presented at trial demonstrated that the alleged victim was highly intoxicated, had likely fallen at least once, and was gently, not forcefully, led back to the truck. No force or threat of harm was used against the young lady." Jackson asserts that there was no evidence that J.S. experienced any distress, compulsion, or fear of harm. He further claims that, even if his grabbing J.S.'s elbow and directing her to the truck constituted sufficient force, "his actions would be under a privilege of necessity t[o] protect an intoxicated person from additional harm."

{¶ 27} The State's evidence in support of the abduction charge was provided by Howell and J.S.. Contrary to Jackson's assertion, Howell's testimony did not indicate that Jackson gently directed J.S. back to his truck. Rather, Howell testified the man (i.e., Jackson) stopped the woman (i.e., J.S.) by her elbow and that J.S. appeared to resist Jackson's efforts to get her back to the truck and tried to get away. In her 911 call, which was played for the jury, Howell told the dispatcher that the man "grabbed" the woman and "dragg[ed]" her back to the truck while she tried to get away. Howell testified that it did not appear that Jackson was attempting to render any aid to J.S..

{¶ 28} J.S. expressly testified that Jackson repeatedly hit her in the face with his

fist while in the truck, and thereafter she repeatedly told him to let her go. According to J.S., when she tried to climb into the back seat, Jackson grabbed her by the hair, pulled her back, and banged her face against the dashboard. Although J.S. did not recall the stop at the Speedway, she testified that she would have run if she had been able to get out away and that she was in severe pain and could barely see. J.S. testified that she repeatedly told Jackson to let her go. J.S. further testified that Jackson's actions caused facial injuries, and several witnesses observed J.S. with a bloody face. Viewing the evidence in the light most favorable to the State, there was sufficient evidence to support Jackson's conviction for abduction. Moreover, we cannot conclude that the jury lost its way when it concluded that Jackson, without privilege, restrained J.S.'s liberty by force under circumstances that created a risk of physical harm to J.S..

### B. Domestic Violence

{¶ 29} Jackson was also convicted of domestic violence, in violation of R.C. 2919.25(A). R.C. 2919.25(A) provides: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." The phrase "family or household member" includes "[a] spouse, a person living as a spouse, or a former spouse of the offender." R.C. 2919.25(F)(1)(a)(i). "Person living as a spouse" is defined by the statute as "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2).

{¶ 30} Jackson argues that the only witness to the domestic violence was J.S., who was highly intoxicated and provided varying accounts of what happened that evening

to the police, some of which were inaccurate. Noting that J.S. had a leaf in her hair and mud on her clothing, Jackson also contends that J.S. could have received her injuries by falling.

{¶ 31} Jackson's domestic violence conviction was supported by the testimony of several witnesses. J.S. testified that she and Jackson had been living together since October 2017, when they started dating. According to J.S., during the evening of December 25, 2017, when the two were in Jackson's truck, Jackson punched her in the face six or seven times. When J.S. tried to climb into the back seat, Jackson grabbed her hair, pulled her back, and banged her face against the dashboard. J.S. testified that she sustained facial injuries from Jackson's assault. Howell observed J.S.'s bloody face and described it as being "like a horror movie." She also saw Jackson moving J.S. back to the side of the truck as J.S. appeared to resist. After Jackson's vehicle was stopped, Officer Lightner also observed J.S.'s "very bloody" face. Officer Lightner observed and photographed blood spatter that was found above the glove box in the truck. Officer Lightner testified that the blood looked fresh, and J.S. testified that she had not previously bled in the truck. Viewing the evidence in the light most favorable to the State, we conclude that the State presented sufficient evidence of domestic violence.

{¶ 32} Moreover, we cannot conclude that Jackson's conviction was against the manifest weight of the evidence. It was the province of the jury to evaluate J.S.'s and the other witnesses' credibility. In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *E.g., State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. J.S. acknowledged that she was highly intoxicated when Jackson

assaulted her, that she did not recall many events clearly, and that she provided multiple statements to the police, which were inconsistent. In addition, Howell inaccurately reported Jackson's race in her 911 call.

{¶ 33} Nevertheless, J.S.'s testimony was unequivocal that Jackson had assaulted her in his truck and caused her facial injuries. Howell's and Officer Lightner's observations of J.S.'s face corroborated J.S.'s testimony that she had recently sustained facial injuries, and the presence of fresh blood spatter above the glove compartment area of the truck supported J.S.'s testimony that she was assaulted in the truck. In addition, Howell explained her inaccurate description of Jackson, stating that she was focused on J.S.'s appearance, not on Jackson's. The fact that Howell followed Jackson's vehicle from the Speedway supported a conclusion that it was Jackson and J.S. that she actually had seen at the gas station, despite Howell's inaccurate description of Jackson. We cannot conclude the jury clearly lost its way and created such a manifest miscarriage of justice that Jackson's conviction for domestic violence must be reversed and a new trial ordered.

{¶ 34} Jackson's assignments of error are overruled.

### III. Conclusion

{¶ 35} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .


HALL, J. and TUCKER, J., concur.

Copies sent to:

David M. Morrison
Jennifer E. Marietta
Hon. Michael A. Buckwalter